8 F.3d 820
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Timothy Scott SHERMAN, Petitioner-Appellant,
v.
Sewall B. SMITH, Warden, Maryland Penitentiary; J. Joseph
Curran, JR., Attorney General for the State of
Maryland, Respondents-Appellees.
 No. 92-6947.
 United States Court of Appeals,
Fourth Circuit.
 Argued: May 5, 1993.
Decided: October 27, 1993.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore.
 Andrew Lewis Frey, Mayer, Brown & Platt, Washington, D.C., for Appellant.
 Ann Norman Bosse, Assistant Attorney General, Office of the Attorney General, Baltimore, Maryland, for Appellees.
 Roy T. Englert, Jr., James G. Duncan, Mayer, Brown & Platt, Stuart H, Robinson, Bel Air,Maryland, Washington, D.C., for Appellant.
 J. Joseph Curran, Jr., Attorney General of Maryland, Office of the Attorney General, Baltimore, Maryland, for Appellees.
 Before PHILLIPS and MURNAGHAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 PER CURIAM:
 
 OPINION
 
 1
 Timothy Sherman was convicted of murdering his parents and currently is incarcerated in the Maryland Penitentiary in Baltimore. On petition for a writ of habeas corpus, he has challenged his conviction on the ground that his constitutional rights were violated by a juror's unauthorized and unsupervised visit during his trial to the crime scene. Upon the district court's denial of a writ, Sherman filed a timely notice of appeal.
 
 
 2
 At approximately one o'clock in the morning of October 12, 1987, Ann and Stevenson Sherman were murdered in their sleep, each killed by a single shotgun blast. Eighteen-year-old Timothy Sherman, Ann's natural son and Stevenson's adopted son, reported that he had been in bed when he heard a single shotgun blast, his mother's screams, and then another shotgun blast followed by silence. He ran to the nearby house of his maternal grandfather, William Gibson, arriving at approximately 1:30 a.m. Gibson testified that"Timmy" was "very much out of breath and upset," that he had been crying, and that it took some time for him to calm down enough to explain what had happened. The two returned to the Shermans' house, where Gibson entered Ann and Stevenson Sherman's bedroom and discovered that they were dead. Gibson told his grandson that his parents were dead, causing him to cry again. The grandfather then called other family members and the police. Almost immediately the house filled with people-paramedics, police, family, and even the press.
 
 
 3
 In their investigation on the day of the murder, the police made two discoveries which were to be the basis of the State's case charging Timothy Sherman with the murder of his parents. First, two deputies, with the aid of a trained dog, found a Stevens 12-gauge shotgun that belonged to the Shermans tightly lodged in a pine tree near the grandparents' house. An examination of the weapon revealed that it had fired the two shells found in the hallway outside Ann and Stevenson Sherman's bedroom. Additionally, a fingerprint on the weapon matched that of Timothy. At trial, the prosecution theorized that the location of the weapon pointed toward Timothy's guilt as he had once used the tree as a hiding place.
 
 
 4
 The second piece of evidence introduced by the prosecution against Timothy was a box of Remington 12-gauge shotgun shells which was found under the mattress of Timothy's bed. The box, which was designed to hold five shotgun shells, contained three shells that matched the two expended shells found outside the victims' bedroom.
 
 
 5
 Those two pieces of evidence represented the case against Timothy. The State did not introduce any evidence of motive. In addition, two tests of Timothy's hands for gunpowder residue-one a highly sophisticated neutron activation test-which were taken only hours after the shooting failed to reveal any evidence to support the State's case. Likewise, his clothes tested negative for gunpowder residue and no blood was found on any of his clothes, on his person, or in his bedroom. The lack of gunpowder residue was especially notable because a heavy accumulation of residue was found in Timothy's parents' bedroom.
 
 
 6
 Timothy also has noted weaknesses in the two pieces of circumstantial evidence which the prosecution relied upon. The State introduced nothing besides the location of the box of shells to establish that it was Timothy Sherman who placed the box under his bed. The box was discovered after many people had been in the house, and thus it was theoretically possible that someone else placed it under Timothy's mattress. The police had not tested the box for fingerprints, so none were introduced.
 
 
 7
 The key evidence appeared to be the shotgun and its location. Regarding the presence of his prints on the murder weapon, Timothy previously reported to the investigating officers on the morning of the shooting that he had fired the gun the day before the murder, and an FBI fingerprint expert testified at trial that another person could have used the gun without leaving any prints or removing prints that had been left on the gun within the preceding days.
 
 
 8
 As to the location of the weapon, trial witnesses testified that the pine tree was a well-known neighborhood hiding place. More important, perhaps, was the testimony of the two police officers who removed the gun from the tree. Corporal Hopkins, a strong six-footer, testified that the shotgun was so forcefully lodged in the tree that he "would have had difficulty putting the gun inside the tree in the condition [he] found it." Hopkins weighed 210 pounds, Timothy Sherman 130. In addition, the investigating officers discovered no evidence of pine needles or pine tar on Timothy the day after the murders.
 
 
 9
 Less than one year after the murder of his parents, Timothy Sherman went on trial before a jury in Harford County, Maryland. In its case-in-chief, the prosecution presented extensive evidence describing and otherwise concerning the pine tree where the murder weapon was found and the surrounding property. The State sought to demonstrate that it was possible for Timothy to commit the murders, remove all traces of gunpowder from himself and his belongings, hide the shotgun in the tree, and run to his grandfather's house.
 
 
 10
 The State showed the jury a videotape of the outside of the Sherman house and the surrounding property, aerial photographs showing the relative locations of the Gibson house, the Sherman house, and the pine tree, several photographs of the tree, and testimony of both neighbors and police officers regarding the tree and the property. After the State had introduced most of that evidence and after the trial judge denied a motion by Timothy for a jury visit to the site, one member of the jury, unbeknownst to the trial court or the parties, decided to visit the neighborhood and inspect the site.
 
 
 11
 Juror Blane Miller revealed subsequent to the trial that a few days into the trial, he had driven, accompanied by his wife, "to the Sherman house and then [ ] drove back the streets from the Sherman house, back to the entrance of Gibson Manor in looking for a tree that was so involved in the case." Miller testified at a post-trial hearing that he had never been in that neighborhood before but had determined its location from the evidence presented at trial and that he found the tree but did not leave his car more closely to inspect it. He acknowledged, however, that as a juror he had received the jury handbook which instructed jurors not to speak with others regarding the case or consider evidence other than that presented in the court room. Although the state trial judge would not allow Miller to be questioned regarding either his reasons for visiting the site or the possible influence the site visit had on jury deliberations, Miller did indicate during the hearing that he inspected the scene because he wanted to see "the tree that was so much in question."
 
 
 12
 At the conclusion of the trial, the jury convicted Timothy Sherman of two counts of first degree murder. Based on Miller's revelation, however, defense counsel made a motion for a new trial. Timothy Sherman argued to the trial court that the site visit by Miller violated his Sixth Amendment rights and justified a new trial. The state trial court when reviewing Sherman's challenge simply relied on its past ruling that a jury site visit was unnecessary and thereby concluded that any such visit was extraneous and irrelevant:
 
 
 13
 I'm convinced that I denied the view, not because I felt that any significant information would come about, but I felt it would be a waste of time and expense to take the jury out there because I felt the issue was fully covered.
 
 
 14
 The state trial judge failed to make an independent determination or to require the prosecution to explain why the admittedly constitutional error was harmless. Instead, he simply placed the burden of proof on Sherman and relied on his own previous ruling without investigating whether the error was structural, i.e., one of law, or merely a trial error. See Sullivan v. Louisiana, 113 S.Ct. 2078, 2082-83 (1993). The trial court then sentenced Timothy Sherman to two consecutive terms of life imprisonment.
 
 
 15
 On its direct review of Sherman's conviction, the Maryland Court of Special Appeals deferred to the trial judge's discretion. In addition, that court also assumed the burden of proof was on Sherman: "Sherman's bald averment fails to indicate how the juror's improper action prejudiced the case." The Court of Special Appeals of Maryland upheld the conviction.
 
 
 16
 Both the Maryland Court of Appeals and the United States Supreme Court denied Timothy Sherman's requests for a writ of certiorari, although Justices White and Marshall would have granted cert. Having exhausted his post-conviction relief in the Maryland courts, Timothy Sherman sought a writ of habeas corpus from the United States District Court for the District of Maryland.
 
 
 17
 The district court referred the case to a magistrate judge who recommended that the writ not be granted. In his Report and Recommendation, the magistrate judge concluded, as an initial matter, that Sherman bore the burden of proving that the error was not harmless. Next, the magistrate judge, taking the position that Timothy had to meet the clearly erroneous standard, accepted the state court's conclusion that Sherman failed to prove that the juror's site visit was not harmless. The district judge, in a one-page memorandum and order, adopted the magistrate judge's report.
 
 
 18
 The district court relied also on answers to questions which had not actually been investigated. It, therefore, may have imposed an improper standard of review on Timothy with regard to the state court's determination of harmlessness and may improperly have placed the burden of showing the error was not harmless on the defendant. The Supreme Court has ruled consistently that habeas courts must review the entire record de novo in determining whether a trial error affecting substantial rights influenced jury deliberations and that the burden of showing harmlessness rests with the state. See Kotteakos v. United States, 328 U.S. 750 (1946).
 
 
 19
 Recently, the Supreme Court employed de novo review in a case in which it concluded that Kotteakos governed federal habeas corpus determinations of whether constitutional error of trial type was harmless. Brecht v. Abrahamson, U.S., 113 S.Ct. 1710 (1993); see also Wright v. West, U.S. # 6D 6D6D6D# ,, 112 S.Ct. 2482, 24922493 (1992) (engaging in de novo review); Chapman v. California, 386 U.S. 18, 24 (1967). Therefore, perhaps, the district court, in reviewing Sherman's constitutional challenge, should have first decided whether the question was one of law, i.e., subject to de novo review. See also United States v. Thompson, 744 F.2d 1065, 1068 (4th Cir. 1984) (reviewing de novo an alleged violation of right to an impartial jury).
 
 
 20
 The Supreme Court also held in Kotteakos that burden of proof is on prosecutors to explain why trial errors were harmless. Justice Rutledge, writing for the Court, plainly states that unless an error is merely "technical", the burden of sustaining a verdict by demonstrating that the error was harmless rests on the prosecution. Kotteakos, 328 U.S. at 760-761. Here, there has been no decision as to whether or not the error was merely technical. As Justice Stevens notes in his concurrence in Brecht, "[a] constitutional violation, of course, would never fall in [Rutledge's] 'technical' category." Brecht, U.S. at, 113 S.Ct. at 1723-1724 (Stevens, J. concurring).
 
 
 21
 Because the district court erred in not reviewing the entire record de novo to answer questions as to the nature of the error-structural or trial-and whether it was technical or not, and, depending on the answers to those queries, whether the error influenced the jury's deliberations, with the burden on prosecutors to explain why trial errors were harmless, we vacate the district court's order and remand for further findings in accord with Kotteakos .
 
 VACATED AND REMANDED
 
 22
 PHILLIPS, Circuit Judge, concurring in part and f dd@rring in the judgment:
 
 
 23
 I agree with the majority that a state court's finding that a federal constitutional error is harmless is not a "finding of fact" entitled to a presumption of correctness on federal habeas review under 28 U.S.C. § 2254(d); that, instead, the issue of harmlessness is a mixed question of law and fact reviewable de novo on federal habeas. See Dickson v. Sullivan, 849 F.2d 403, 405 (9th Cir. 1981); United States ex rel. Savory v. Lane, 832 F.2d 1011, 1018 (7th Cir. 1987); Lacy v. Gardino, 791 F.2d 980, 986 (1st Cir.), cert. denied, 479 U.S. 888 (1986); cf. Miller v. Fenton, 474 U.S. 104 (1985) ("voluntariness" of confession is a mixed question of law and fact entitled to de novo review on federal habeas); see also Wright v. West, 112 S.Ct. 2482, 2491-92 (1992) (declining invitation to overrule Miller and applys 2254(d) presumption of correctness to mixed questions of law and fact). I also agree that in denying habeas relief here, the magistrate judge failed to conduct a de novo inquiry into the harmlessness of the found Sixth Amendment error, but instead improperly deferred to the state court's prior determination that the error was harmless. Because I think that error alone merits our vacating and remanding here, I concur in the judgment.
 
 
 24
 I write separately, however, because of doubt about the soundness of the majority's alternative holding that the State bears the burden of proving constitutional error harmless on federal habeas review. That surely has been the rule until recently, and it may still be. But the Supreme Court's recent decision in Brecht v. Abrahamson, 113 S.Ct. 1710 (1993), casts enough doubt on its continued validity that I think we should simply stay away from it as an alternative ground of decision.
 
 
 25
 The principal issue in Brecht was what standard should be used to decide whether constitutional error may be disregarded as harmless on federal habeas: the stringent standard of Chapman v. California, 386 U.S. 18, 24 (1967) (error is harmless only if reviewing court can say, "beyond a reasonable doubt," that the error "did not contribute to the verdict obtained"), or the relatively more forgiving standard of Kotteakos v. United States, 328 U.S. 750, 776 (1946) (error is harmless unless reviewing court can say that it "had a substantial and injurious effect or influence in determining the jury's verdict"). The Court held that while the Chapman standard applies to most constitutional errors on direct review, the more lenient Kotteakos standard should apply to those same errors on federal habeas review, because it is "better tailored to the nature and purpose of collateral review and more likely to promote the considerations underlying this Court's recent habeas jurisprudence." Id. at 1722.
 
 
 26
 The majority here assumes that in adopting Kotteakos 's harmlessness standard for use in federal collateral review, the Brecht Court also intended to adopt Kotteakos 's separate holding that the burden of proving a particular error harmless under that standard rests with the State. Slip op. at 6. With all respect, I am not so sure that Brecht can be read to do this. It is true that the Brecht majority did not specifically consider the question of who bore the burden of proof with respect to harmlessness on federal habeas. But Chief Justice Rehnquist, writing for a majority of five, used language that strongly suggested the Court intended to place that burden on the habeas petitioner, rather than the State. See 113 S.Ct. at 1722 (under the newly-adopted Kotteakos standard, "habeas petitioners ... are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' ") (emphasis added). Three of the four dissenters specifically read that language as a deliberate re-casting of the burden of proof with respect to harmlessness from the State to the habeas petitioner. See 113 S.Ct. at 1735, 1727 (White, J., joined by Justice Blackmun and by Justice Souter, in relevant part, dissenting) ("the Court now invokes Kotteakos ... to impose on the defendant the burden of establishing that the error 'resulted in actual prejudice ' ") (emphasis added). Only Justice Stevens, who joined the Chief Justice's opinion for the Court but also wrote a separate concurring opinion, indicated that he understood the Court's adoption of the Kotteakos standard to leave the burden of showing harmlessness "on prosecutors." 113 S.Ct. at 1723 (Stevens, J., concurring).
 
 
 27
 Because Justice Stevens provided the critical fifth vote to affirm the judgment below, I suppose we might read his concurrence as controlling on the burden-of-proof question. But I think this runs an unnecessary risk here, for several reasons. First, Justice Stevens also joined the majority opinion, with its contrary suggestions about the location of the burden of proof. Second, Justice Stevens' remark that the burden of proof would remain on prosecutors seems more one made in passing than an explicit expression of disagreement with the contrary intimations in the majority opinion. Finally, Justice White's reading, in dissent, of the majority opinion-as adopting a different rule on the cast of the burden of proof on harmlessness for federal habeas review than applies on direct review-is more consistent with the obvious design of recent decisions of the Court confining the scope of federal collateral relief and emphasizing that it is not automatically available simply because a petitioner has proved an error that might merit reversal on direct appeal.[1] For these reasons, I think that in prudence, whatever we may think of the rule, we should assume that the Brecht Court meant exactly what its majority opinionsaid: that the habeas petitioner has the burden of proving a constitutional error prejudicial-i.e., not harmless-under the Kotteakos standard.[2]
 
 
 28
 Because I think it unwise and unnecessary to rest decision on the burden of proof point, the improper deference basis being sufficient,
 
 
 29
 I do not join those portions of the majority opinion discussing allocation of the burden of proof.
 
 
 
 [1]
 See, e.g., Teague v. Lane, 489 U.S. 288 (1989) (although new rules of law have retroactive application in criminal cases on direct review, they seldom do on federal habeas); Pennsylvania v. Finley, 481 U.S. 551
 (1987) (although a criminal defendant has a constitutional right to counsel on direct appeal, he has no such right on federal habeas); United States v. Frady, 456 U.S. 152 (1982) (while the federal "plain error" rule applies in determining whether a defendant may raise a claim for the first time on direct appeal, the stricter "cause and prejudice" standard applies in determining whether that same claim may be raised on federal habeas); Stone v. Powell, 428 U.S. 465 (1976) (Mapp claims are not cognizable on federal habeas, even when they might merit reversal on direct review).
 
 
 [2]
 In this connection, it may be appropriate to note that under legislation currently pending in Congress, 28 U.S.C. § 2254(d) would be amended to make clear that the State bears the burden of persuading the court that constitutional error was harmless on federal collateral review. H.R. 3131, 103rd Cong., 1st Sess. § 303 (1993) (amending 28 U.S.C. § 2254(d) to add that on federal habeas, "[i]n the case of a violation that can be harmless, the State shall bear the burden of proving harmlessness")