30 F.3d 139
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Paul Albert GUARDADO, Petitioner-Appellant,
v.
Jerry STAINER, Warden; Attorney General of the State of
California, Respondents-Appellees.
 No. 92-56190.
 United States Court of Appeals, Ninth Circuit.
 Submitted Oct. 8, 1993.*
Withdrawn from Submission Jan. 28, 1994.
Resubmitted Aug. 5, 1994.
Decided Aug. 5, 1994.
 
 1
 Before: FLETCHER and D.W. NELSON, Circuit Judges, and WILL,** District Judge.
 
 
 2
 MEMORANDUM***
 
 
 3
 Appellant Paul Guardado was convicted in 1989 in California state court for the second degree murder of Stephen Buus. Guardado appeals the district court's dismissal of his petition for a writ of habeas corpus. Guardado alleges that, at trial, he was denied his rights under the Sixth Amendment when his counsel failed to provide competent assistance, and when the trial court erroneously admitted certain damaging hearsay evidence, depriving him of his Sixth Amendment right to confront the witnesses against him. We have jurisdiction pursuant to 28 U.S.C. Sec. 2253.
 
 
 4
 Because we hold that Guardado's Confrontation Clause rights were violated, and conclude that the error was not harmless, we grant the petition. We do not reach Guardado's ineffective assistance of counsel claim.
 
 I. FACTS AND PRIOR PROCEEDINGS
 
 5
 In August 1984, Corina Ribota went to the police and inquired about a $5,000 reward that had been offered for information relating to the September 24, 1979, murder of Steven Buus in Sigler Park in Westminster, California. A police detective, Richard Skarpho, tape-recorded an interview with Ribota concerning the murder. Ribota's statements were not made under oath. In the interview, Ribota said that she had been in the park with a group of youths on the night of the murder, and that a number of the youths had surrounded Buus, who happened to be passing through the park. Buus was beaten and eventually shot three times, twice with a handgun and once with a shotgun. Ribota unambiguously identified Gabriel Ramirez as the individual who had fired the fatal shotgun blast.
 
 
 6
 In the 1984 interview, Ribota also claimed that Paul Guardado was in the park on the evening of the murder, and that he was in the circle of individuals that had surrounded the victim. Ribota initially stated that she saw Guardado with a handgun at the scene of the crime. When prompted by Detective Skarpho to confirm this statement, however, her responses were equivocal. When she first was asked to confirm that she saw Guardado holding a gun, Ribota responded that she heard, but did not see, the shots fired. When Skarpho again asked pointedly whether she ever saw the gun, her response was evasive--she stated only that she saw the victim on the ground, and someone running from the scene. Later in the interview, however, Ribota volunteered that she "knew it was Guardado" who had fired the first two shots. When Skarpho asked how she knew this, Ribota responded that, at a gathering after the shooting, "people were talking and everything." Ramirez and Guardado subsequently were charged with murder and assault with a deadly weapon.
 
 
 7
 At the California state trial of the two defendants, conducted in August 1989, the prosecution relied heavily on the transcript of the 1984 tape-recorded interview with Ribota. It also elicited testimony from Kim Arganda and Katina Hughes, acquaintances of Guardado, Ramirez, and the other people who were in the park on the night of the shooting. Arganda testified that, earlier on the night of the shooting, she had been in a car with Guardado, a man named Vincent Orozco, and Manuel Ibarra, the owner of the car. Arganda said that Guardado and Orozco, who were seated in the back, suggested that they stop people whose looks they did not like and "get" them. Both Guardado and Orozco had guns in the car, and at one point had asked Arganda and Ibarra to retrieve the guns from under the front seats and pass them back. Arganda also testified, however, that although she knew Ramirez had a shotgun in his trenchcoat, she did not know whether Guardado and Orozco had taken their handguns with them when they left the car, or whether they at any time had the guns with them in the park.
 
 
 8
 Arganda further testified that she met up with Hughes in the park, and that she had gone to a rest room with Hughes just prior to the shooting. Both women testified that although they did not see the shooting, they heard something and then saw a number of people leaving the scene, including Guardado. Hughes only remembered hearing a single blast; Arganda recalled three shots. Hughes testified that Guardado was "near tears" as he left the scene and Arganda testified that she heard Guardado say something to the effect of "I didn't think they were going to do it," or "I can't believe what they did."
 
 
 9
 When Ribota testified at trial in August 1989, almost exactly ten years after the shooting and five years after her tape-recorded interview, she claimed to remember almost nothing of the incident. She testified that she vaguely recalled having been at the park when Buus was killed, but could not remember what other individuals had been present, let alone who had participated in the killing. Ribota also testified that she did not recall ever having spoken about the incident with Skarpho.
 
 
 10
 Defense counsel elicited testimony from Ribota that, except when she was incarcerated, she had used a variety of narcotics, principally PCP, continuously from 1979 to 1986, and that friends had noted big gaps in her memory concerning events in this period. Ribota also testified in court that although her recall of specific events was poor, she did remember being constantly in need of money at the time of the 1984 interview, and described herself as having been a "pathetic" liar, willing to make up stories whenever it suited her immediate needs. Ribota further testified that she had been aware that a $5,000 reward had been offered for evidence relating to the Buus murder. Government counsel sought to discredit Ribota's loss-of-memory claims by noting that Ribota had testified that she last used drugs in 1986, but her forgetfulness apparently was not limited to the pre-1986 period as her testimony in court conflicted not only with her 1984 statements, but also with statements she had made at the preliminary hearing eleven months prior to trial.
 
 
 11
 Despite Ribota's inability or refusal to confirm or contradict the substance of the 1984 interview, the interview was allowed into evidence as a prior inconsistent statement. Emphasizing that Ribota had been deliberately evasive in her answers while on the stand, the trial court concluded that the tape and transcript of the 1984 interview could be admitted and used as substantive evidence under California Code of Evidence Sec. 1235.[1] Defense counsel objected to the admission of the 1984 interview in its entirety, and separately objected to admission of the portion of the interview in which Ribota identified Guardado as a participant. With respect to the latter objection, the trial court ruled that although Ribota's statements were "ambivalent" concerning whether she actually had seen Guardado with a gun, the ambiguities in her statements went to the weight rather than the admissibility of the evidence.
 
 
 12
 In closing argument, the defense focused on discrediting Ribota, noting her years of drug abuse, her need for money and awareness of the $5,000 reward at the time of the 1984 interview, and her own prior convictions. Counsel for Guardado also briefly noted the ambiguities in Ribota's testimony and the fact that Orozco as well as Guardado had been seen with a handgun earlier on the night of the shooting. At the close of evidence, the jury was instructed that it could find Guardado guilty of murder if it found that he had fired the first shots or if it found that he had aided and abetted the murder. The only instruction specifically informing the jury of the findings necessary to support a murder conviction on an aiding and abetting theory, although prefaced as a first degree murder instruction, spoke in more general terms. The instruction provided:
 
 
 13
 If you find that the defendant, Paul Guardado, is legally responsible for the death of Stephen Alan Buus on an aiding and abetting theory, you must find:
 
 
 14
 (1) That Paul Guardado is guilty of the underlying offense of assault with a deadly weapon, beyond a reasonable doubt;
 
 
 15
 (2) That a natural and probable cause of that assault ... was the killing of Steven Buus; and
 
 
 16
 (3) If you find that Paul Guardado was not the shooter, but did in fact aid and abet the killing of Steven Buus, it is necessary under the aiding and abetting theory that he share another person's mental state of premeditation and deliberation.
 
 
 17
 In its verdict, the jury found Ramirez guilty of first degree murder and assault with a deadly weapon, and found Guardado guilty of second degree murder and assault with a deadly weapon. Both convictions were affirmed by the California Court of Appeal. The state court of appeal held that although it was proper for the trial court to introduce Ribota's tape-recorded interview as a prior inconsistent statement, Ribota's statement that she knew that Guardado fired the first two shots because "people were talking and everything" was inadmissible hearsay because Guardado never had a chance to cross-examine any of the unidentified "people" alleged to have identified him as the shooter. The state court of appeal, however, noting that Ribota also had implicated Guardado in the properly admitted portions of the 1984 interview, ruled that the error was harmless. The California Supreme Court denied review without comment. Guardado filed a petition for a writ of habeas corpus in federal district court claiming ineffective assistance of counsel and Confrontation Clause violations. Adopting the findings of a magistrate, the district court dismissed the petition with prejudice. Guardado timely filed this appeal.
 
 II. STANDARD OF REVIEW
 
 18
 We review a dismissal of a petition for writ of habeas corpus de novo. Robbins v. Christianson, 904 F.2d 492, 494 (9th Cir.1990). We review admittance of hearsay evidence that implicates a violation of the Confrontation Clause de novo. United States v. George, 960 F.2d 97, 99 (9th Cir.1992).
 
 III. DISCUSSION
 
 19
 Guardado raises two Confrontation Clause claims. He first alleges that the trial court erred when it admitted into evidence the 1984 tape-recorded interview with Ribota. He next alleges that, even if admission of the taped interview was proper, the trial court committed reversible error in allowing the jury to consider the portion of the tape in which Ribota identified Guardado as a shooter based on statements allegedly made by unidentified third parties.[2] Because we agree that the trial court's erroneous admission of the latter portion of the tape was not harmless, we do not reach Guardado's broader challenge to the admission of the tape-recording as a whole.
 
 
 20
 Guardado claims that his conviction should be reversed because the trial court erroneously allowed into evidence the portion of the tape in which Ribota explains that she knew he shot the victim because, at a gathering after the shooting, "people were talking and everything." As a preliminary matter, we note that although a colorable argument can be made that Ribota's other statements in the 1984 interview fall within the "prior inconsistent statement" exception to the common law hearsay rule, the statements on the portion of the tape challenged by Guardado are indisputably hearsay. As the California Court of Appeals ruled, although Ribota testified in court, the unidentified "people" alleged to have identified Guardado as the shooter did not.
 
 
 21
 "Hearsay testimony is barred by the Confrontation Clause in criminal cases unless, inter alia, it has 'adequate indicia of reliability.' The reliability requirement is satisfied if the statement falls within a 'firmly rooted hearsay exception' or if it is supported by 'particularized guarantees of trustworthiness.' " George, 960 F.2d at 99 (quoting Idaho v. Wright, 497 U.S. 805, 815 (1990) (internal citations omitted)). Here, the state does not suggest that the evidence--Ribota's report of what she had heard unidentified third parties say about Guardado five years before her tape-recorded interview--falls within a firmly rooted exception, or that the reliability of the statements is otherwise supported by any guarantee of trustworthiness. Accordingly, we hold that the trial court's erroneous admission of this portion of the 1984 interview not only violated the California hearsay rules, but also violated Guardado's rights under the Confrontation Clause of the Sixth Amendment. Confrontation Clause violations, however, are reviewed for harmless error, United States v. Magana-Olvera, 917 F.2d 401, 409 (9th Cir.1990), and we must determine whether the constitutional violation prejudiced Guardado.
 
 
 22
 In Brecht v. Abrahamson, 113 S.Ct. 1710, 1713-14 (1993), the Supreme Court held that the Kotteakos standard for reviewing trial errors applies in habeas cases. Under the Kotteakos standard, reversal is proper only where "the error had substantial and injurious effect or influence in determining the jury's verdict." Kotteakos v. United States, 328 U.S. 750, 776 (1946);[3] Brecht, 113 S.Ct. at 1722 (suggesting that the Kotteakos standard requires a showing of "actual prejudice"). As the Kotteakos Court explained, the reviewing court must not judge the effect of the error based on its own assessment of the evidence, but, instead, must make "allowance for how [the jury] might react and not be regarded generally as acting without reason." Id. at 764. The Court elaborated this explanation as follows:
 
 
 23
 [T]he question is, not were [the jurors] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision....
 
 
 24
 The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.
 
 
 25
 Id. at 764-65. Accordingly, we must determine whether there is "grave doubt" as to whether the inadmissible hearsay evidence had a substantial influence on the jury's deliberations.
 
 
 26
 We begin with the jury charge. As described above, the jury was instructed that it could find Guardado guilty of murder if it found that Guardado was the one who fired the first two shots at the victim, or if it found that Guardado was not the shooter, but aided and abetted the murder. The only evidence in the record that positively identifies Guardado as a shooter is the portion of the 1984 interview challenged by Guardado, and if the conviction necessarily depended on a finding that Guardado fired the first two shots, we could not conclude that the error was harmless. Here, however, the inquiry is complicated by the fact that the jury also could have relied on the aiding and abetting theory. The fact that we cannot know which theory the jury relied on, of course, itself cuts against a finding that the error was harmless--Kotteakos directs us to consider whether it is likely that the jury actually was influenced by the error, and the possibility that the jury based its verdict on a finding that Guardado was a shooter thus casts doubt on whether the error can be deemed harmless. We need not decide here, however, whether the possibility that the jury found Guardado to be a shooter casts sufficient doubt on the effect of the error to mandate reversal because we conclude that it is also likely that the erroneously admitted evidence affected the jury's determination of whether Guardado aided and abetted the murder.
 
 
 27
 Although the jury instructions on aiding and abetting are not easily deciphered, the record strongly suggests that, at a minimum, the jury was required to find that Guardado aided in the commission of the crime by threatening Buus with a gun prior to the murder. This was the understanding of the instructions communicated to the jury by the prosecutor in his closing argument, and was the sole aiding and abetting theory proffered by the prosecution in the course of the trial.
 
 
 28
 As indicated above, the only instruction specifically addressing the predicate findings for a murder conviction on an aiding and abetting theory was prefaced as a first degree murder instruction, but spoke in more general terms. The instruction provided in relevant part: "If you find that the defendant, Paul Guardado, is legally responsible for the death of Stephen Alan Buus on an aiding and abetting theory, you must find ... [t]hat Paul Guardado is guilty of the underlying offense of assault with a deadly weapon, beyond a reasonable doubt." Although there was no comparable instruction outlining the necessary predicates for a conviction of second degree murder on an aiding and abetting theory, the jury was instructed that the elements of second degree murder include all the elements of first degree murder except the mens rea element of "deliberation and premeditation," and the jury expressly was told that "mere presence at the scene of a crime ... does not amount to aiding and abetting." Moreover, in its general aiding and abetting instructions, the court explained that an aider and abetter must have acted with the mental state necessary for conviction of the underlying offense. For second degree murder, this mental state was malice aforethought, and the court earlier had explained that, in the absence of a concrete verbal expression of malice, the jury must find that the "natural and probable consequences" of the defendant's acts were dangerous to human life. In discussing the aiding and abetting theory in closing argument, the prosecutor interpreted the "natural and probable" consequences language to require a finding that Guardado brandished a gun at the scene. The prosecutor contended: "Let's say Paul Guardado [just] had his handgun out, as Corina Ribota suggests, and he didn't shoot.... I suggest to you, that even though he was just standing there with the gun in his hand, a natural and probable consequence of these men with guns is somebody is going to get shot and killed."
 
 
 29
 Accordingly, we conclude that if the erroneous introduction of the hearsay evidence likely had a determinative influence on the jury's evaluation of whether Guardado was present at the scene with a gun in his hand, we must reverse.
 
 
 30
 As the following analysis demonstrates, the only admissible evidence putting Guardado at the scene of the crime with a handgun was contained in the non-hearsay statements made by Ribota in the 1984 interview. Those statements were ambiguous, however, and were followed almost immediately by the inadmissible hearsay statements. Because we conclude that the jury's interpretation of the ambiguity necessarily was influenced by the inadmissible hearsay, application of the Kotteakos standard precludes a finding that the error was harmless.
 
 
 31
 Apart from Ribota's tape-recorded statement, the only evidence relevant to the assault charge against Guardado was Arganda's testimony that Guardado had a gun earlier on the day of the shooting. Arganda's testimony, although relevant, is of relatively little value in this context because Arganda did not know whether Guardado took his gun when he left the car and did not recall seeing Guardado in the park with a gun that night. Indeed, neither Arganda nor Hughes, who both remembered having seen Guardado in the park after the shooting, testified that they remembered seeing him with a gun. Moreover, although Arganda and Hughes stated that they saw Guardado leave the scene of the crime, Arganda testified that Guardado had said something to the effect of "I didn't think they were going to do it," seemingly exonerating rather than implicating Guardado as an active participant in the assault.
 
 
 32
 Accordingly, the only properly admitted evidence tending to show that Guardado brandished a gun at the scene of the crime is contained in the following passage from the 1984 interview:
 
 
 33
 Skarpho: Uh, let's get down to the heavy shit. You heard two shots. You didn't see them fired.
 
 
 34
 Ribota: I didn't see two shots fired cause I was walking away.
 
 
 35
 Skarpho: But, you did see who had the, the handgun at the time?
 
 
 36
 Ribota: Uh huh.
 
 
 37
 Skarpho: Who was it?
 
 
 38
 Ribota: Paul.
 
 
 39
 Skarpho: Paul who?
 
 Ribota: Guardado (unintelligible)
 
 40
 Skarpho: Okay, Paul Guardado had the handgun in his hand.
 
 
 41
 Ribota: Well, I didn't see it, I heard, I heard the two shots and went back, you know, I just went back, I seen Paul, okay. And then ...
 
 
 42
 * * *
 
 
 43
 Skarpho: Now, did you see Paul Guardado with the handgun in his hand. Did you ever see the handgun?
 
 
 44
 Ribota: I went back, seen the guy laying there, I looked at all three, they were all around him, I think. I used, okay, I went back, right, and this guy was running. That shot at him.
 
 
 45
 Although Ribota initially places a gun in Guardado's hand in this passage, she appears to withdraw from this position when pressed by Skarpho. After Ribota says that she saw Guardado with a gun, the detective prompts Ribota, saying, "Okay, Paul Guardado had the handgun in his hand." Ribota then immediately qualifies her statement, responding, "Well, I didn't see it, I heard, I heard the two shots and went back, you know, I just went back, I seen Paul, okay." This passage is ambiguous--the word "it" in the phrase "I didn't see it " could have been in direct response to the question, and thus an admission by Ribota that she never actually saw the gun, or the word could have referred to the shooting, with Ribota assuming that it was established that she had seen Guardado with the gun. Because there was no opportunity for cross-examination, of course, the jury had little to rely on to resolve the ambiguity.
 
 
 46
 Significantly, however, when Ribota subsequently was asked point blank, "Now, did you see Paul Guardado with the handgun in his hand. Did you ever see the handgun?," she again does not answer directly, instead saying evasively, "I went back, seen the guy laying there, I looked at all three, they were all around him, I think. I used, okay, I went back, right, and this guy was running. That shot at him." The identity of the "guy [who] was running" is unclear, and Skarpho did not pursue the matter. Several sentences later, however, when Ribota explains for the first time that she knows that Guardado fired the first shots, the detective responds: "How do you know that?" This time, Ribota makes no reference to what she had seen, but instead offers the inadmissible hearsay evidence--her report of what other people allegedly had said at the gathering after the shooting.
 
 
 47
 Although the California Court of Appeals ruled that admission of this last piece of evidence was harmless because the jury could have found assault beyond a reasonable doubt based on Ribota's other statements concerning Guardado, the appeals court, focusing on state law issues, did not apply the analytical framework articulated in Kotteakos. As described above, Kotteakos requires that the reviewing court evaluate the effect of the constitutional error not in the abstract, but by trying to gauge the actual impact on the jury. The California Court of Appeals looked only at Ribota's admissible statements concerning Guardado without evaluating what effect the inadmissible hearsay had on the jury's interpretation of those statements.
 
 
 48
 Had it considered solely the non-hearsay statements, the jury might well have concluded that Guardado was with the group of people standing near the victim, but was not necessarily holding a gun. As the trial court noted, Ribota's 1984 statements concerning whether she saw Guardado with a gun were ambivalent. Given the ambiguity in Ribota's properly admitted statements, Ribota's repeated failure to confirm definitively that she saw Guardado with a handgun, the lack of any substantial corroborating evidence, and the fact that the statements were made five years after the murder by a self-professed drug addict seeking to obtain a $5,000 reward, the jury might well have concluded that Ribota's statements fail to prove beyond a reasonable doubt that Guardado held a gun at the scene of the crime. The likelihood that the jury would have interpreted the ambiguity in Ribota's non-hearsay statements in Guardado's favor, however, was lessened substantially by the introduction of the hearsay. Once it had been suggested that people at the post-shooting gathering identified Guardado as the one who had fired the first two shots, the jury can only have believed that others had seen Guardado at the scene with a gun, thus making it significantly more likely that the jury would resolve the ambiguity in the properly admitted statements against Guardado.
 
 
 49
 On this record, we cannot say that the introduction of the inadmissible hearsay evidence was without "substantial ... effect or influence in determining the jury's verdict." Kotteakos, 328 U.S. at 776. On the contrary, we conclude that the introduction of the inadmissible portion of the 1984 interview necessarily shaped the jury's interpretation of the ambiguities in the admissible portion of the interview, thereby creating "grave doubt" as to whether the error was without substantial influence on the verdict. Accordingly, we hold that the error was not harmless.
 
 CONCLUSION
 
 50
 We hold that Guardado's Sixth Amendment rights were violated by the trial court's erroneous admission of the hearsay portions of the 1984 interview with Ribota, and conclude that the error was not harmless. Thus, we conclude that the writ must be granted. However, as this court has previously stated:
 
 
 51
 A federal court is vested "with the largest power to control and direct the form of judgment to be entered in cases brought up before it on habeas corpus.' " The court is "free ... to fashion the remedy as law and justice require ... [and is not required] to order [petitioner's] immediate release from physical custody."
 
 
 52
 Sanders v. Ratelle, 21 F.3d 1446, 1461 (9th Cir.1994) (internal citations omitted). Exercising our discretion, we further conclude that the state shall have an opportunity to re-try Guardado, should it so desire. Only if it fails to do so within a reasonable time shall Guardado be released. Although we have not addressed all of Guardado's challenges to the admissibility of the evidence used against him in the first trial, nothing in this opinion should be interpreted to foreclose his right to reassert his claims in the event he is re-tried. The clerk is directed to include in the mandate to the district court direction to the district court to notify the State of California forthwith of the grant of the writ.
 
 
 53
 REVERSED and REMANDED.
 
 
 
 *
 The panel finds this case appropriate for submission without argument pursuant to 9th Cir.R. 34-4 and Fed.R.App.P. 34(a)
 
 
 **
 The Honorable Hubert L. Will, United States District Court Judge for the Northern District of Illinois, sitting by designation
 
 
 ***
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit R. 36-3
 
 
 [1]
 Section 1235 provides:
 Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770.
 Cal.Evid.Code Sec. 1235 (West 1966).
 
 
 [2]
 Guardado also suggests that the trial court erred in admitting the portions of the tape immediately preceding Ribota's reference to the statements of unidentified third parties--Guardado claims that a close reading of the transcript shows that Ribota's initial statements also derived in part from what Ribota had heard the third parties say. We take no position on this contention because we conclude that, even assuming that all other portions of the tape were properly admitted, admission of the reference to the third party statements was reversible error
 
 
 [3]
 An ambiguity in the Brecht opinion has led to considerable confusion concerning whether the prosecution or the defense should have the burden of showing that the error was harmless. Brecht was a 5-4 decision. In the lead opinion, endorsed by four justices, the Court stated, without analysis, that "habeas petitioners ... [must] establish that [the error] resulted in 'actual prejudice.' " Brecht, 113 S.Ct. at 1722 (citation omitted) (emphasis added). Justice Stevens, however, who provided the decisive fifth vote, emphasized in his concurring opinion that he was convinced that the Kotteakos standard was appropriate because, inter alia, it "places the burden on prosecutors to explain why [constitutional errors] were harmless." Id. at 1723. The Supreme Court recently has granted certiorari to clarify the matter. See O'Neal v. Morris, 3 F.3d 143 (6th Cir.1993), cert. granted, 114 S.Ct. 1396 (1994); see also Hardnett v. Marshall, 25 F.3d 875, 879-80 (9th Cir.1994) (noting the contradictory signals in Brecht and declining to resolve the matter); Ayala v. Leonardo, 20 F.3d 83, 90 (2d Cir.1994) (same); Sherman v. Smith, 1993 WL 433317 at * 4-6, 1993 U.S.App. LEXIS 28095 at * 12-* 17 (4th Cir. Oct. 27, 1993) (Phillips, J., concurring) (discussing the ambiguity). We need not resolve the burden of proof question here, however, because, even assuming that Guardado has the burden of proof, he has shown that the error was not harmless